Filed 2/26/14; pub. order 3/13/14 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SAUNDRA CARTER et al., <br><br>     Plaintiffs and Respondents, <br><br>     v. <br><br> CITY OF LOS ANGELES, <br><br>     Defendant and Respondent; <br><br> MARK WILLITS et al., <br><br>     Objectors and Appellants. | B241060 <br><br> (Los Angeles County <br> Super. Ct. No. BC363305) |

APPEAL from a judgment of the Superior Court of Los Angeles County. John Shepard Wiley, Jr., Judge. Reversed.

Jose R. Allen; Schneider Wallace Cottrell Konecky, Guy B. Wallace; Goldstein, Borgen, Dardarian & Ho, Linda M. Dardarian for Objectors and Appellants.

Sarah Colby as Amicus Curiae on behalf of Objectors and Appellants.

Arias Ozzello & Gignac, Mark Arias, Mikael H. Stahle, Alfredo Torrijos; Law Offices of Morse Mehrban, Morse Mehrban for Plaintiffs and Respondents.

Michael N. Feuer, Los Angeles City Attorney, Gary G. Geuss, Chief Assistant City Attorney, Laurie Rittenberg, Assistant City Attorney; Ogletree, Deakins, Nash, Smoak & Stewart, David Raizman, Dennis Depalma, Benjamin Ikuta; Drinker Biddle & Reath, Christopher F. Wong for Defendant and Respondent City of Los Angeles.

Title II of the Americans with Disabilities Act (42 U.S.C. § 12132; the ADA), Section 504 the Rehabilitation Act of 1973 (29 U.S.C. § 794 et seq.; Section 504), the Unruh Civil Rights Act (Civ. Code, § 51 et seq.), and the California Disabled Persons Act (Civ. Code, § 54) prohibit discrimination against disabled individuals and require that public entities eliminate impediments to disabled access to public facilities. (See *Ability Ctr. of Greater Toledo v. City of Sandusky* (6th Cir. 2004) 385 F.3d 901, 907-908; *Donald v. Cafe Royale, Inc.* (1990) 218 Cal.App.3d 168, 177-178.) "For nearly two decades, [the ADA's] implementing regulations have required cities to make newly built and altered sidewalks readily accessible to individuals with disabilities." (*Frame v. City of Arlington* (5th Cir. 2011) 657 F.3d 215, 221.)

This class action litigation involves allegations that the City of Los Angeles violated the above statutes. After the parties conditionally agreed to certify a non opt-out class, settle the litigation for injunctive relief only, and release all claims for statutory damages, the trial court certified the class and approved the settlement, finding it to be fair and reasonable.

Appellants contend the settlement was meager and inadequate and the non opt-out provision violated due process. We disagree with the first contention but agree with the second. Therefore, we reverse.

## FACTS AND PROCEEDINGS BELOW

a.     The *Carter* and *Fahmie* Actions

On December 17, 2006, ten individuals led by Saundra Carter filed a class action complaint against the City of Los Angeles for violations of the Unruh Civil Rights Act and Disabled Persons Act, alleging city sidewalks lacked wheelchair ramps or cutouts. In their first amended complaint, which is operative, the *Carter* plaintiffs sought injunctive relief and "minimum statutory damages of $1,000 per violation of Civil Code sections 54 and 54.1."

On December 5, 2007, Nicole Fahmie filed a class action complaint against the City of Los Angeles for violations of the Unruh Civil Rights Act and Disabled Persons

Act, alleging, among other things, that city curbs lack ramps or cutouts. Fahmie sought injunctive relief, compensatory damages and trebled damages.

Neither the *Carter* nor *Fahmie* action alleged federal claims under the ADA or Section 504. The actions were eventually consolidated.

b.     The *Willits* Action

On August 4, 2010, Mark Willits, a quadriplegic, Judy Griffin, who has muscular dystrophy, and Brent Pilgreen, also a quadriplegic, all of whom use motorized wheelchairs for mobility, and Communities Actively Living Independent and Free, an independent living center (objectors/federal plaintiffs), filed a representative action against the City of Los Angeles and its mayor and council members in federal court alleging causes of action pursuant to the ADA, Section 504, the Unruh Civil Rights Act and the California Disabled Persons Act. (The *Willits* action.) The federal plaintiffs alleged the city systemically and pervasively discriminated against persons with mobility disabilities by denying them meaningful access to the city's curb ramps, sidewalks, crosswalks, pedestrian crossings, and other walkways. They sought declaratory relief, preliminary and permanent injunctions for the class, and, on behalf of Willits, Griffin and Pilgreen individually, monetary damages.[1]

On December 10, 2010, the district court declined to exercise jurisdiction over the federal plaintiffs' state law claims in the *Willits* action, and dismissed them, and also dismissed all individual defendants, leaving only the City of Los Angeles as a defendant. The court then refused to dismiss plaintiffs' claims under the ADA and Rehabilitation Act, characterizing them as claims for "only equitable remedies under the ADA, such as injunctive relief." (The record does not disclose why the federal plaintiffs' damages claims were stricken.) (*Willits v. City of Los Angeles*, No. CV 10-05782 CBM; U.S. Dist. Court, Central District.)

On January 3, 2011, the district court certified a representative class defined as follows: "All persons with mobility disabilities who have been denied access to

---

[1] All parties request for judicial notice are granted.

3

pedestrian rights of way in the city of Los Angeles as a result of Defendants' [*sic*] policies and practices with regard to its pedestrian rights of way and disability access. The class is certified for injunctive and declaratory relief only. The class claims are Count I (alleging violations of the ADA) and Count II (alleging violations of the Rehabilitation Act) of Plaintiffs' Complaint." The court waived notice of certification to the class members.

c.      *Carter* and *Fahmie* Settlement

In April 2011, the *Carter* and *Fahmie* actions settled. The settlement class was defined as all persons with any disability who at any time prior to April 25, 2011 through the term of the settlement (25 years) accessed or attempted to access a city sidewalk but were impeded by lack of a curb ramp or curb cut.

Pursuant to the settlement agreement, the City of Los Angeles agreed to install up to 1,000 curb ramps in the first year after settlement, at a cost of up to $3.5 million. After the first year, the city agreed to spend up to $4 million per year remediating curbs, contingent on the availability of certain types of funds, and to complete remediation, without limit as to cost, as to every curb identified as being in a "Transition Area," which was defined as comprising major commercial corridors, bus routes, and public buildings. The city agreed to conduct a citywide survey to assess curb locations requiring remediation, form an advisory committee to evaluate and make recommendations to the city about future curb appropriations, and periodically report to class counsel regarding settlement implementation status, with ongoing court jurisdiction.

Plaintiffs agreed to release all claims against the city for injunctive or declaratory relief or statutory damages (but not compensatory damages) that are based on conduct or conditions preceding entry of judgment. This would include release of appellants' federal claims and state law damages claims.

The settlement agreement provided that the settlement class would be certified in accordance standards applicable under the Federal Rules of Civil Procedure, rule 23(b)(2) (Rule 23(b)(2)), and that no class member would be permitted to opt out. The agreement

4

further provided that notice of the settlement would be made by distribution to ten organizations serving disabled persons and by publication.

d.      Objections to the Settlement and Final Approval

Prior to the hearing on final approval, 30 individual class members objected to the settlement. Their main objection was that the settlement set no mandatory minimum city expenditure, instead making expenditure contingent on future tax revenue availability, did not require that enough curb cut or ramps be installed, and set no date for full compliance with disability access laws. Objectors also argued the settlement gave class members no money payments and no ability to opt out to seek statutory damages in another forum.

On January 11, 2012, the trial court issued a 38-page order granting final approval of the settlement. In the order the court outlined settlement terms, found them to be reasonable, and addressed the objectors' arguments. As to objectors' arguments that the settlement was meager and inadequate, the court reviewed the city's obligations under the settlement, finding them to be substantial, and noted that it would be a risky and time consuming proposition for class representatives to pursue litigation to obtain a better result. Regarding the non opt-out provision, the court stated the settlement was "equitable and not for a money judgment," so "[t]he requirement that class members be permitted to opt out . . . does not apply." The court also said, "statutory damages are a long shot" and the right to them "highly questionable" because no California court has considered a municipal entity to be liable under the Unruh Civil Rights Act or the Disabled Persons Act, and none likely would.

This appeal followed.

## DISCUSSION

### A.    General Class Action Principles and Standard of Review

Under section 382 of the Code of Civil Procedure, a class action is authorized "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court." "Drawing on the language of Code of Civil Procedure section 382 and federal precedent,"

5

our Supreme Court has "articulated clear requirements for the certification of a class. The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives." (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021; *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326 (*Sav-On*).)

The purpose of the ascertainability question is to give notice to putative class members as to whom the judgment in the action will be res judicata so they will have an opportunity to opt out of the class. (*Bufil v. Dollar Financial Group, Inc*. (2008) 162 Cal.App.4th 1193, 1206-1207.) "'The doctrine of res judicata rests upon the ground that the party to be affected, or some other with whom he is in privity, has litigated, or had an opportunity to litigate the same matter in a former action in a court of competent jurisdiction, and should not be permitted to litigate it again to the harassment and vexation of his opponent. Public policy and the interest of litigants alike require that there be an end to litigation.'" (*Citizens for Open Access etc. Tide, Inc. v. Seadrift Assn*. (1998) 60 Cal.App.4th 1053, 1065.) "[R]es judicata benefits both the parties and the courts because it 'seeks to curtail multiple litigation causing vexation and expense to the parties and wasted effort and expense in *judicial administration*.'" (*Mycogen Corp. v. Monsanto Co*. (2002) 28 Cal.4th 888, 897.) "After the members of the class have been properly notified of the action, they are required to decide whether to remain members of the class represented by plaintiffs' counsel and become bound by a favorable or unfavorable judgment in the action, whether to intervene in the action through counsel of their own choosing, or whether to 'opt out' of the action and pursue their own independent remedies, such as negotiation with defendants, initiation of their own action, or intervention in some other action." (*Home Sav. & Loan Assn. v. Superior Court* (1974) 42 Cal.App.3d 1006, 1010; accord, Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group) ¶ 14:133, p. 14-80 (rev. # 1, 2010).) "The critical reason for notification of members of the class on whose behalf a class action has been brought is that notification makes possible a binding adjudication and an

6

enforceable judgment with respect to the rights of the members of the class.  Absent such notification no member of the class need be bound by the result of the litigation."  (*Home Sav. & Loan Assn.*, *supra*, at p. 1011.)

The "community of interest" requirement embodies three elements: "(1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class.  [Citation.]"  (*Sav-On*, *supra*, 34 Cal.4th at p. 326.)  Common issues predominate when they would be "the principal issues in any individual action, both in terms of time to be expended in their proof and of their importance."  (*Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 810.)  Class members "must not be required to individually litigate numerous and substantial questions to determine [their] right to recover following the class judgment; and the issues which may be jointly tried, when compared with those requiring separate adjudication, must be sufficiently numerous and substantial to make the class action advantageous to the judicial process and to the litigants."  (*City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 460.)

The question of certification is essentially procedural and does not involve the legal or factual merits of the action.  (*Sav-On*, *supra*, 34 Cal.4th at p. 326.)  The ultimate question is whether class treatment is "superior means of resolving the litigation, for both the parties and the court.  [Citation.]  'Generally, a class suit is appropriate "when numerous parties suffer injury of insufficient size to warrant individual action and when denial of class relief would result in unjust advantage to the wrongdoer." [Citations.]' [Citation.]  '[R]elevant considerations include the probability that each class member will come forward ultimately to prove his or her separate claim to a portion of the total recovery and whether the class approach would actually serve to deter and redress alleged wrongdoing.' [Citation.]  '[B]ecause group action also has the potential to create injustice, trial courts are required to "'carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts.'" [Citation.]' [Citation.]"  (*Newell v. State Farm General Ins. Co*. (2004) 118 Cal.App.4th 1094, 1101.)

7

Trial courts have broad discretion in granting or denying motions for class certification because they are ideally situated to evaluate the efficiencies and practicalities of permitting a class action. (*Sav-On*, *supra*, 34 Cal.4th at p. 326.) We will affirm an order granting class certification if any of the trial court's stated reasons is valid and sufficient to justify the order and is supported by substantial evidence. (*Id*. at pp. 326-327; *Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1106 ["a certification ruling not supported by substantial evidence cannot stand"].) However, even a ruling supported by substantial evidence will be reversed if improper criteria were used or erroneous legal assumptions made. (*Sav-On*, *supra*, 34 Cal.4th at pp. 326–327; *Linder v. Thrifty Oil Co*. (2000) 23 Cal.4th 429, 435-436.) A trial court's decision that rests on an error of law is itself an abuse of discretion. (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311; *Pfizer Inc. v. Superior Court* (2010) 182 Cal.App.4th 622, 629.)

## B.     Approval of Class Action Settlements

The parties agree that the trial court's ruling is subject to an abuse of discretion standard of review. "[W]hether a settlement was fair and reasonable, whether notice to the class was adequate, whether certification of the class was proper, and whether the attorney fee award was proper are matters addressed to the trial court's broad discretion." (*Wershba v. Apple Computer, Inc*. (2001) 91 Cal.App.4th 224, 234-235, citing *Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794 (*Dunk*).) A reviewing court has characterized appellate review of class action settlements as "gross at best and, given that 'so many imponderables enter into the evaluation of a settlement' [citation], an abuse of discretion standard . . . is singularly appropriate." (*7-Eleven Owners for Fair Franchising v. Southland Corp.* (2000) 85 Cal.App.4th 1135, 1166-1167.)

When class certification is deferred to the settlement stage, a more careful scrutiny of the fairness of the settlement is required. "The fairness of a settlement of a legal dispute is like the adequacy of the consideration supporting a contractual promise: a matter best left to negotiation between the parties. A settlement is a contract, and normally the test for the fairness of a contract is strictly procedural: were the parties competent adults duly apprised of the basic facts relating to their transaction? The

problem in the class-action setting, and the reason that judicial approval of the settlement of such an action is required, [citation], is that the negotiator on the plaintiffs' side, that is, the lawyer for the class, is potentially an unreliable agent of his principals." (*Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co*. (7th Cir. 1987) 834 F.2d 677, 681-682.) This "makes it imperative that the district judge conduct a careful inquiry into the fairness of a settlement to the class members before allowing it to go into effect and extinguish, by the operation of res judicata, the claims of the class members who do not opt out of the settlement." (*Ibid*.) The inquiry must "be especially careful and penetrating in a case such as this where class certification is deferred to the settlement stage." (*Ibid*.) But because so many imponderables enter into the evaluation of a settlement, we continue to review the trial court's decision to approve a settlement in such a case under the "abuse of discretion" standard.

Upon certification of a class the court must make an order determining whether notice to class members is necessary and whether class members may exclude themselves from the action. (Cal. Rules of Court, rule 3.766, subd. (c).) Approval of a class action settlement requires (1) the trial court's preliminary approval of the proposed settlement; (2) dissemination of notice to class members, if necessary, informing them of the proposed settlement and their right to object to the action; and (3) a final fairness hearing where class members may be heard regarding the fairness, adequacy and reasonableness of the settlement. (Cal. Rules of Court, rule 3.769, subds. (d)-(g).) To approve the settlement, the court must determine that "'the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.'" (*Dunk*, *supra*, 48 Cal.App.4th at p. 1801.)

"[A] presumption of fairness exists where: (1) the settlement is reached through arm's-length bargaining; (2) investigation and discovery are sufficient to allow counsel and the court to act intelligently; (3) counsel is experienced in similar litigation; and (4) the percentage of objectors is small." (*Dunk*, *supra*, 48 Cal.App.4th at p. 1802.) The objector bears the burden to rebut the presumption. (*7-Eleven Owners for Fair*

9

*Franchising v. Southland Corp.*, *supra*, 85 Cal.App.4th at p. 1166; *Dunk*, *supra*, at p. 1800; see 4 Conte & Newberg, Newberg on Class Actions (4th ed. 2002) § 11:42, p. 118-119.)

A general release—covering "all claims" that were or could have been raised in the suit—is common in class action settlements. (See, e.g., *Dupuy v. McEwen* (7th Cir. 2007) 495 F.3d 807, 809.) If a class member thinks a release is too broad, he can seek to remedy that problem through objection or intervention, and, if not satisfied with the result, he could appeal. (See *Toms v. Allied Bond & Collection Agency, Inc*. (4th Cir. 1999) 179 F.3d 103, 105–107.) Alternatively, he could simply opt out of the class and render the scope of the release irrelevant as to him.

## C. The Settlement was Fair

Appellants argue the trial court lacked basic information to determine the range of plaintiffs' potential recovery at trial, and the *Carter*/*Fahmie* settlement is unfair because it guarantees funding for installation of only 1,000 curb ramps during the first year of the settlement and makes curb remediation in years two through twenty-five of the settlement contingent on availability of funds. Appellants argue 1,000 curb ramps constitutes less than one percent of the city's own estimate of 108,000 curb ramps it needs to install to comply with Title II of the ADA. The arguments are without merit.

The record discloses that the settlement was a product of extensive research and investigation of the conditions of curbs in Los Angeles. The settlement judge and trial court were well aware of the state of Los Angeles curbs and had the added benefit of objectors' presentation on that topic at the fairness hearing. The city's estimate that 108,000 curb ramps need to be installed to comply with the ADA was made in a 1998 memorandum; no evidence suggests this number is current. On the contrary, respondents presented evidence that the city has required private property owners to construct or repair curb cuts when performing construction and has itself constructed at least 32,000 curb cuts since the late 1990's. In addition, the settlement agreement calls for a comprehensive survey of Los Angeles city streets to determine where curb cuts are needed.

10

Furthermore, we would be in no position to overrule the trial court's determination that installation of 1,000 curb cuts in the first year of settlement is reasonable even if substantial research on the issue had been lacking. Appellants acknowledge the city has no obligation to install a curb cut on every corner. Under Title II of the ADA, the standard for compliance is "program access," that is, when viewed in its entirety, the city's system of sidewalks and pedestrian walkways must be "readily accessible to and useable by individuals with disabilities." (28 C.F.R. § 35.159(a); 45 C.F.R. § 84.22(a); Gov. Code, § 11135, subd. (b).) The number of curb cuts to be installed in the first year of settlement is significant, and when we consider that the curbs first remediated will be those chosen by class members themselves, and will therefore presumably address members' most immediate and pressing concerns, the possibly small proportion of initial fixes fades in importance.

We also agree with the trial court that the contingent funding provisions covering years two through twenty-five of the settlement are facially reasonable. When a city "has constructed curb ramps where necessary to provide access along highly-trafficked routes, has allocated funding and established a schedule for future curb ramp construction, and is addressing the particular intersections identified by plaintiffs as well as other intersections in accordance with ADA priorities," it is in compliance with its Title II obligations. (*Schonfeld v. City of Carlsbad* (1997) 978 F.Supp. 1329, 1341.)

Appellants argue the settlement guarantees less curb ramp installation than the city is already performing, as evidenced by a Bureau of Street Services report that the city installs from 1,500 to 1,800 per year. Whether a settlement requires more or less performance than a defendant is already providing voluntarily is irrelevant to whether the settlement is fair. The question is how many curbs will be guaranteed under the settlement, not how many were installed last year or how many the city intends to install voluntarily next year. That the city may not be obligated under the settlement to do more than it would do on its own goes to the value of the settlement to the city, not its fairness to plaintiffs.

11

Appellants argue the trial court improperly devalued their claims when it expressed doubt that the city's pedestrian rights of way and curb ramps were covered by Title II of the ADA or could be the subject of a private right of action. The point is irrelevant, as the reasonableness of the settlement stands on its own, independent of any concept of claim valuation.

We further note that of the 280,000 class members appellants claim exist, only 30 objected. This small percentage indicates the settlement was fair. Considering there was arm's-length bargaining; adequate investigation and discovery by experienced counsel; and a small percentage of objectors, we conclude the settlement was presumptively fair, adequate and reasonable, a presumption objectors have failed to overcome. (See *Dunk*, *supra*, 48 Cal.App.4th at p. 1801; *Kullar v. Foot Locker Retail, Inc*. (2008) 168 Cal.App.4th 116, 133.)

## D.     Certification of an Non Opt-Out Class Violated Due Process

One aspect of the settlement agreement here gives us pause, in that the agreement provided: "The Parties agree that the Settlement Class shall be certified in accordance with the standards applicable under Rule 23(b)(1) and/or Rule 23(b)(2) of the Federal Rules of Civil Procedure and that, accordingly, no Settlement Class member may opt out of any of the provisions of this Agreement." This provision is troubling for two reasons. Strictly speaking, parties to an agreement cannot logically bind nonparties with a provision stating the parties agree the nonparty cannot deny the agreement. So the provision is of no effect absent some mechanism by which nonparties are made party to the agreement, i.e., an order certifying the class. The non opt-out provision is of no force absent such an order. In that respect, then, the non opt-out class is best evaluated for whether certification was proper, not whether the settlement was fair.

The second problem with the settlement is it purports to bind the court to a particular sort of certification. This the parties cannot do. It is for the trial court, not the parties, to determine whether and in what manner a matter is best certified. The question is whether a non opt-out class should have been certified pursuant to Rule 23(b)(2). We conclude it should not.

12

**E.    Rule 23(b)(2) Classes**

California law does not address when a trial court should afford class members a right to opt out. (*Bell v. Am. Title Ins. Co.* (1991) 226 Cal.App.3d 1589, 1602-1603.) We therefore look to federal law for guidance. (*Green v. Obledo* (1981) 29 Cal.3d 126, 145-146.) The United States Supreme Court has recently provided guidance about Rule 23(b)(2) classes that is directly on point here.

Rule 23(b)(2) permits class treatment when the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Claims for individualized relief do not satisfy the Rule. (*Wal-Mart Stores, Inc. v. Dukes* (2011) 131 S.Ct. 2541, 2557 (*Wal-Mart*).) "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.' [Citation.] In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." (*Ibid.*)

Classes certified under Rule 23(b)(2) share the most traditional justifications for class treatment—that "the relief sought must perforce affect the entire class at once." (*Wal-Mart*, *supra*, 131 S.Ct. at p. 2558.) For that reason, Rule 23(b)(2) provides no opportunity for class members to opt out, and does not oblige the trial court to notify class members of the action. (*Ibid.*)

Individualized monetary claims therefore do not belong in a Rule 23(b)(2) class. The procedural protections attending other types of classes—"predominance, superiority, mandatory notice, and the right to opt out—are missing from (b)(2) not because the Rule considers them unnecessary, but because it considers them unnecessary *to a (b)(2) class*. When a class seeks an indivisible injunction benefitting all its members at once, there is

13

no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute. Predominance and superiority are self-evident. But with respect to each class member's individualized claim for money, that is not so . . . . Similarly, (b)(2) does not require that class members be given notice and opt-out rights, presumably because it is thought (rightly or wrongly) that notice has no purpose when the class is mandatory, and that depriving people of their right to sue in this manner complies with the Due Process Clause. In the context of a class action predominantly for money damages we have held that absence of notice and opt-out violates due process. [Citation.] While we have never held that to be so where the monetary claims do not predominate, the serious possibility that it may be so provides an additional reason not to read Rule 23(b)(2) to include the monetary claims here." (*Wal-Mart*, *supra*, 131 S.Ct. at pp. 2558-2559.)

Strictly speaking, California class actions can nether be certified pursuant to Rule 23(b)(2) nor barred from certification by the rule, and even the Supreme Court's elucidation as to what is and is not permitted by Rule 23(b)(2) can be only advisory. But the takeaway from *Wal-Mart* is that the Due Process Clause requires notice and opt-out rights to class members unless "the relief sought must perforce affect the entire class at once." (*Wal-Mart*, *supra*, 131 S.Ct. at p. 2558; *Phillips Petroleum Co. v. Shutts* (1985) 472 U.S. 797, 812.)

Here, appellants seek statutory damages under the Unruh Civil Rights Act and the Disabled Persons Act. The question is whether such damages would constitute individualized relief necessitating notice and opt-out rights or relief incidental to the equitable relief afforded by the settlement agreement, in which case no such rights are necessary.

"Incidental damages are damages 'that flow directly from liability to the class *as a whole* on the claims forming the basis of the injunctive or declaratory relief.' [Citation.]" (*Molski v. Gleich* (2003) 318 F.3d 937, 949.)

Here, the released damages included statutory damages pursuant to the Unruh Civil Rights Act and the Disabled Persons Act. (Civ. Code, §§ 52, 54.3.) These damages

14

were not incidental because they do not flow directly from liability to the class as a whole.

The settlement and trial judges below deemed appellants' damages claims to be "incidental" because they were legally questionable. In other words, statutory damages were "a long shot" and the right to them "highly questionable" because no California court would likely consider a municipal entity to be liable under the Unruh Civil Rights Act or the Disabled Persons Act, the released damages claims were of minimal value and therefore incidental.

We happen to agree that statutory damages are unlikely here. The Unruh Civil Rights Act allows recovery of damages for discrimination "'by a "business establishment" in the course of furnishing goods, services or facilities to its clients, patrons or customers.'" (*Stamps v. Superior Court* (2006) 136 Cal.App.4th 1441, 1449.) A state prison is not a business establishment for purposes of the act unless it engages in behavior involving sufficient "businesslike attributes." (*Qualified Patients Ass'n v. City of Anaheim* (2010) 187 Cal.App.4th 734, 764-765; see *Taormina v. California Department of Corrections* (S.D.Cal. 1996) 946 F.Supp. 829, 833; *Gaston v. Colio* (S.D.Cal. 1995) 883 F.Supp. 508; see also *Curran v. Mount Diablo Council of the Boy Scouts of America* (1998) 17 Cal.4th 670, 676-677 [organization is not a business establishment for purposes of the Unruh Act if the organization is not involved in the sale of access to the basic activities or services of the organization].) An organization has sufficient businesslike attributes to qualify as a business establishment when it "appears to have been operating in a capacity that is the functional equivalent of a commercial enterprise." (*Warfield v. Peninsula Golf & Country Club* (1995) 10 Cal.4th 594, 622.)

We think a public entity providing sidewalks and curbs to its citizens does so as a public servant, not a commercial enterprise. Appellants cite four federal cases to the contrary, three of them unpublished district court cases, and the issue is currently before our Supreme Court on certification of a question from the Ninth Circuit. (*Beauchamp v.*

15

*City of Long Beach*, No. S213420, rev. granted Nov. 26, 2013.)[2] We need not determine the issue definitively here because the overarching point is that appellants deserve to litigate the merits of their claims, not have them dismissed out of hand in a class action settlement.

The trial court appears to have considered appellants' damages claims to be "incidental" because they were of negligible value. With respect, that is not what is meant in the context of Rule 23(b)(2). The justification for denying notice and opt-out rights in a Rule 23(b)(2) class is that such rights are unnecessary where the monetary relief sought "must perforce affect the entire class at once," i.e., is an incident of the equitable relief sought. (*Wal-Mart*, *supra*, 131 S.Ct. at p. 2558.) Although Rule 23(b)(2) principles cannot themselves prescribe what may and may not be done with a class in California, the principles behind the Rule demonstrate that certification of a non opt-out class violated due process and should not be contemplated under Code of Civil Procedure section 382.

For that reason, the order certifying the settlement class and approving settlement must be reversed.

We need not address appellants' arguments going to other class certification requirements such as typicality and adequacy of class representation, which in a Rule 23(b)(2) class are of minimal importance anyway. (*Wal-Mart*, *supra*, 131 S.Ct. at pp. 2558-2559.)

---

[2] Appellants' motion to stay these proceedings pending a resolution of *Beauchamp v. City of Long Beach* is denied. Respondents' motion to dismiss appellants' appeal of the trial court's April 3, 2004 order is denied.

**DISPOSITION**

The order granting class certification and approving final settlement is reversed. The parties are to bear their own costs on appeal.

TO BE PUBLISHED.



                                                    CHANEY, J.

I concur:



MILLER, J.*

_____

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17

Rothschild, Acting P.J., dissenting:

I respectfully dissent. The majority reasons that the resolution of individual claims for monetary damages in a non opt-out class settlement violates due process. The only authority for that proposition is a two-sentence passage in *Wal-Mart Stores, Inc. v. Dukes* (2011) 131 S.Ct. 2541 (*Wal-Mart*). In that passage, the United States Supreme Court observed that "[i]n the context of a class action predominantly for money damages we have held that absence of notice and opt-out violates due process. [Citation.]" (*Wal-Mart*, *supra*, 131 S.Ct. at p. 2559.) The Court followed that observation with this sentence: "While we have never held that to be so where the monetary claims do not predominate, the serious possibility that it may be so provides an additional reason not to read [Federal Rule of Civil Procedure] 23(b)(2) to include the monetary claims here." (*Ibid.*) The Court's suggestion that a due process violation is a "serious possibility" in the absence of notice and opt-out rights in a class action involving nonpredominating claims for monetary damages is the sole basis for the majority's conclusion that the superior court order before us violated due process.

I am not persuaded. First, the relevant sentence of *Wal-Mart* is not only dictum but also expressly acknowledges that the Court has "never held" that lack of notice and opt-out rights in a class action with nonpredominating claims for monetary damages *always* violates due process. (*Wal-Mart*, *supra*, 131 S.Ct. at p. 2559.) Second, that passage in *Wal-Mart* is inapplicable here in any event, because it refers to "absence of notice and opt-out" (*ibid.*), but here class members were given notice and the opportunity to object. *Wal-Mart* says nothing, even in dictum, about whether the absence of opt-out rights in these circumstances would violate due process. Third, the settlement in this case secures highly valuable benefits for all class members, and those benefits overwhelmingly predominate over the objectors' individual claims for monetary damages, which are probably worthless. Under the circumstances of this case, there is no "serious possibility" (*ibid.*) that certification of the class and approval of the settlement violates due process.

For all of the foregoing reasons, I would affirm the superior court's order. I therefore respectfully dissent.


ROTHSCHILD, Acting P. J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SAUNDRA CARTER et al., | B241060 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC363305) |
| v. | |
| CITY OF LOS ANGELES, | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Respondent; | |
| MARK WILLITS et al., | |
| Objectors and Appellants. | |

THE COURT:

The opinion filed in the above-entitled matter filed on February 26, 2014, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____*
ROTHSCHILD, Acting P. J.            CHANEY, J.            MILLER, J.*

_____

   * Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.